UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BENTSION COHEN AND NAOMI COHEN,          :

              Plaintiffs,          :

                                        OPINION AND ORDER

    -v.-          :

                                      12 Civ. 5828 (GWG)

UNITED STATES OF AMERICA,          :

              Defendant.          :
-------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiffs Bentsion Cohen and Naomi Cohen brought this action seeking a refund of a

federal income tax assessment.   The Court held a bench trial and, for the reasons stated below,

finds in favor of the defendant.

I.   BACKGROUND

       On July 31, 2012, plaintiffs Bentsion Cohen ("Bentsion") and Naomi Cohen ("Naomi")

(collectively, "the Cohens") filed a complaint against the United States of America seeking a

refund of federal income tax pursuant to 26 U.S.C. § 7422.   See Complaint, filed July 31, 2012

(Docket # 1) ("Compl.").   The parties consented to disposition of this matter by a United States

Magistrate Judge as provided in 28 U.S.C. § 636(c).   Prior to trial, the parties submitted

memoranda of law, proposed findings of fact, and a joint pre-trial order, which included

stipulated facts.[1]   The bench trial was held on August 26, 2013, and September 17, 2013.

_____

    [1]   See Plaintiffs' Memorandum of Law, filed May 28, 2013 (Docket # 18) ("Pl. Pre-Trial
Mem."); Plaintiffs' Proposed findings of Fact and Conclusions of Law, filed May 28, 2013
(Docket # 19); Government's Memorandum of Law, filed May 28, 2013 (Docket # 20) ("Gov't
Pre-Trial Mem."); Government's Proposed Findings of Fact and Conclusions of Law, filed May
28, 2013 (Docket # 21); Revised Joint Pre-Trial Order, filed May 29, 2013 (Docket # 22)
("JPTO"); Plaintiffs' Reply Memorandum of Law, filed June 14, 2013 (Docket # 24).

Following trial, the parties submitted additional materials summarizing their arguments and proposed findings.[2]

In brief, the Cohens contend that $500,000 of their gain on the sale of an apartment they owned in New York City is excludable from income under 26 U.S.C. § 121.  See Pl. Pre-Trial Mem. at 4.  The Cohens acknowledge that in order to qualify for this exclusion from federal income taxation they "must have owned and used [the apartment] as their principal residence for at least two of the last five years prior to the sale."  Id.  To achieve this two-year threshold, the Cohens need to count at least part of the time period that their son and his family lived in this apartment.  Id.  The Government contends that the Cohens cannot do so because the apartment in question "was not an extension of Plaintiffs' principal residence during the time period" that the Cohens' son and his family lived there.  Gov't Pre-Trial Mem. at 9.

This case raises two issues: 1) whether the Cohens incorrectly applied the Section 121 exclusion to the sale of their apartment, and 2) whether the imposition of a penalty for underpayment of income tax is warranted.  (Tr. 208).[3]  Having considered the parties' submissions and the evidence presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  In brief, the Court finds that the Cohens have not demonstrated their entitlement to a refund of tax on

---

[2]  See Government's Proposed Findings of Fact and Conclusions of Law, filed Nov. 25, 2013 (Docket # 30) ("Gov't Post-Trial Mem."); Plaintiffs' Post-Trial Brief Including Proposed Findings of Fact and Conclusions of Law, filed Nov. 25, 2013 (Docket # 31) ("Pl. Post-Trial Mem."); Reply to Plaintiffs' Post-Trial Proposed Findings of Fact and Conclusions of Law, filed Dec. 9, 2013 (Docket # 32) ("Gov't Post-Trial Reply Mem."); Plaintiffs' Post-Trial Reply Brief, filed Dec. 9, 2013 (Docket # 33) ("Pl. Post-Trial Reply Mem.").

[3]  "Tr." refers to the transcript of the trial in this matter which appears on ECF at Docket ## 34 & 36.

$500,000 of the gain they excluded from income pursuant to 26 U.S.C. § 121.  Nor have they

demonstrated that they are entitled to a refund of the penalty imposed by the Internal Revenue

Service ("IRS") for underpayment of tax on that sale.

II.  FACTS

The Court's findings of fact are based on the facts stipulated by the parties as well as the

testimony and exhibits presented at trial.  Deposition testimony read into the transcript during the

first day of trial was also admitted into evidence.  (Tr. 185-86).

A.  Stipulated Facts

Bentsion and Naomi have lived at 119 W. 71st Street, Apartment 8A ("8A"), since the

1970's.  JPTO ¶ 1.  They still reside in Apartment 8A.  Id. ¶ 34.  They purchased 8A in the early

1980's when their apartment building became a co-op.  Id. ¶ 2.  In 1990, they purchased

Apartment 8C at 119 W. 71st Street ("8C") for $175,000.  Id. ¶ 3.  Apartments 8A and 8C are

adjacent apartments.  Id.  ¶ 4.  The Cohens never structurally modified 8A or 8C to combine or

otherwise create internal access between the two units.  Id. ¶ 5.  During the time period when the

Cohens owned both 8A and 8C, they held a separate stock certificate for each unit, reflecting

ownership of two sets of shares in the 119 West 71st Street Owners Corporation.  Id. ¶ 6.

During the 1990s, up to and including July 2002, the Cohens leased 8C to rental tenants

who paid the Cohens monthly rent.  Id. ¶ 8.  From August 2000 to July 2002, the Cohens

received $3,200 per month for the rental of 8C.  Id. ¶ 9.  In November 2002, the Cohens' adult

son, David Cohen ("David"), and his wife, Nicole Cohen ("Nicole"), moved into 8C.  Id. ¶ 10.

Nicole was pregnant with twins at that time.  Id.  David and Nicole lived in 8C until

approximately August 2004, along with their twin sons who were born in February 2003.

Id. ¶ 11.  While David and Nicole lived in 8C, they maintained a separate phone line, kitchen,

and mailbox from those of the Cohens.  Id. ¶¶ 12-14.  In August 2004, David and Nicole moved

into an apartment they had purchased on West 93rd Street, id. ¶ 15, and in the months

immediately preceding August 2004, Bentsion acted as a general contractor for the renovations

being done to their new apartment, id. ¶ 16.  On May 12, 2005, the Cohens sold 8C for $785,000.

Id. ¶ 18.

Bentsion has a master's degree in business administration from New York University,

and has owned and operated small businesses.  Id. ¶ 20.  Naomi, who had been working as a full-

time teacher, retired in February 2005.  Id. ¶ 17.  Bentsion prepared the Cohens' personal income

tax returns for 2003 and 2004.  Id. ¶ 22.

For the 2003 tax return, Bentsion filed a "Schedule E," which is used to report income

from rental real estate, and he included the monthly payments from David and Nicole as rental

income.  Id. ¶ 23.  He also deducted depreciation for 8C.  Id. ¶ 24. Bentsion checked the box

stating that neither the Cohens nor their family members had used 8C for personal purposes for

more than 14 days in 2003, even though David and his family lived in 8C for all of 2003.  Id.

¶ 25. By the time Bentsion filed the Cohens' 2004 tax return, David and Nicole had moved out

of 8C and the Cohens had decided to start showing the apartment for sale.  Id. ¶ 27.  On the 2004

tax return, Bentsion did not include monthly payments from David and Nicole as rental income

and did not deduct depreciation for 8C.  Id. ¶ 26.

In 2006, Bentsion hired accountant David Lipton to prepare the Cohens' 2005 tax return.

Id. ¶ 28.  The "2005 federal depreciation schedule" that Bentsion provided to Lipton included

representations regarding the cost of renovations to 8C during the time that the Cohens owned it.

Id. ¶ 29.  According to the schedule, the cost of these renovations totaled $155,701, including

$78,500 for renovations in the months leading up to the sale of 8C.  Id.  The Cohens' 2005 tax

return did not reflect income from the sale of 8C, id.¶ 30, and reported that the Cohens owed $6,724 in federal income taxes, id. ¶ 31.  Following an IRS audit of the Cohens' 2005 return, the IRS assessed the Cohens $158,759, consisting of $113,879 in additional taxes, $22,104 in interest, and a penalty of $22,776.  Id. ¶ 32.  The Cohens paid this assessment under protest.  Id. In recalculating the Cohens' gain from the sale of 8C, the IRS included $8,832 in depreciation for 2004.  Id. ¶ 33.

B.  Trial Testimony

We next summarize the pertinent testimony of the witnesses at the trial.  As explained more fully below, we credit the relevant testimony of the witnesses other than Bentsion and Naomi.  With respect to Bentsion and Naomi's testimony, we explain in section II.C the portions of their testimony that we accept and reject.

1.  Bentsion Cohen

Bentsion testified on direct examination that he had three children and that his "intent" in purchasing 8C was to "have a larger quarter because . . . the girls were growing up, and [he] didn't want them to live with boys."  (B. Cohen: Tr. 23).  However, that intent changed "because a year or so later David went to college and the need just didn't exist anymore."  Id.  He testified that during that year before David went to college, "the apartment was basically being cleaned and renovated, and [Bentsion] just put a lot of books and stuff" in 8C, and that "on occasion [Bentsion's] sister at times . . . came to New York, and she stayed for six months"  (B. Cohen: Tr. 24).  The Cohen children did not sleep in 8C during that period.  Id.  The Cohens then rented out the apartment.  (B. Cohen: Tr. 25).  In the periods it was not rented out, from August 2002 through October 2002, and from September 2004 until the apartment was sold on May 12, 2005, guests from Israel and California stayed in the apartment.  (B. Cohen: Tr. 25-26).

5

At some point, David and Nicole attempted to purchase an apartment for themselves, but the deal fell through and they "did not have any place to go." (B. Cohen: Tr. 26). Bentsion therefore "offered [David and Nicole] to come and live with us, and they accepted it." (B. Cohen: Tr. 26). During the time that David and his family occupied 8C, Bentsion and his wife visited 8C "[o]n a daily basis." (B. Cohen: Tr. 27). According to Bentsion, "[e]very day we went in and out all the time, and they came in all the time" and further, "[t]hey ate in our place" and "we ate in their place." Id. Bentsion "never removed [his] stuff from" the apartment, which consisted of books "in a big closet" as well as "winter clothes that [he] kept in the upper closet in the bedroom, and . . . pans and pots and the furnishings." Id. When asked if David paid him or his wife Naomi "any sums related to their occupancy of 8C from November 2002 until August 2004," Bentsion responded that he "personally never got a penny from [his] son" and that "[e]verything was done between [his] wife and [his] son" and that he "never liked" the arrangement. Id. To that end, Bentsion testified, "I decided that whatever monies my son is paying, sooner or later I'll have to return it back to him because that's not how I grew up" and "[a] father does not take money from his son." (B. Cohen: Tr. 28). When asked if, in fact, he returned the money to his son, Bentsion responded, "[i]n a way, I returned it in many ways," because he acted as general contractor for the renovations on David's new apartment and, "at the end of the day, when [David and Nicole Cohen] moved in, I realized that I had paid 40 or 40 some odd thousand dollars over what I had received back from my son." Id.

David Lipton prepared the Cohens' 2005 tax return. (B. Cohen: Tr. 28-29). Bentsion gave Lipton information to assist him in preparing the return, including "summaries and the whole closing book of the sale of the apartment" along with "a letter telling him what [was being sent] together with what [Bentsion] thought had to be done." (B. Cohen: Tr. 29). Bentsion

received the "closing book" from "the lawyer who conducted the sale of Apartment 8C."  Id.

Lipton advised Bentsion on "how to report the sale of Apartment 8C on [his] 2005 federal

income tax return."  (B. Cohen: Tr. 36).  Lipton "gave [him] the return, and [he] signed it, and

that's it" because Bentsion "trusted him."  Id.  With respect to whether Bentsion discussed the

sale of 8C with Lipton, Bentsion testified that they discussed whether the sale had to be reported

on the return, and that he sent Lipton "a letter that clearly indicated that there was a sale, and that

there was a gain, and that [Lipton] had to take care of it."  Id.  Bentsion testified that Lipton told

him, "[i]t's OK.  I took care of it."  Id.  Bentsion testified that he relied on Lipton's advice on

how to report the sale of 8C on his 2005 tax return.  (B. Cohen: Tr. 37).

Schedule E of the Cohens' 2003 tax return shows that the Cohens answered "no" to a

question that asked: "For each rental real estate property listed on line 1 [i.e., Apartment 8C], did

you or your family use it during the tax year for personal purposes for more than the greater

of . . . 14 days or . . . 10% of the total days rented at fair rental value?"  See Gov't Ex. K at 115.

Bentsion testified that he "answered [this question] wrongly" and that his response was

"incorrect."  (B. Cohen: Tr. 37-38).

On cross-examination, Bentsion confirmed that "at no point during [his] ownership of

unit 8C did [he] ever actually make a door [in 8A] to connect it" with 8C, and that "throughout

the time that [he] owned both 8A and 8C the only way to get from 8A to 8C would be to

go . . . into the common hallway and then through the front door of 8C."  (B. Cohen: Tr. 41).  He

stated that "the purpose of the purchase" of 8C was "not to have it for rental [sic]" but for his

family "to expand into it."  (B. Cohen: Tr. 42).  He stated, "since we didn't need it anymore, we

decided to rent it."  Id.  However, at his deposition, Bentsion had testified that "some six months

or five months after [they] bought [8C]," they decided to "make it into an investment property."

(B. Cohen: Tr. 43). The reason for this, he testified at his deposition, was that he and his wife "started calculating [their] budget" and concluded that they could not "afford both ends without some sort of help" because Bentsion "was not doing that well."  Id.

When asked on cross-examination about the arrangement made for David and Nicole to pay money to Bentsion and Naomi while living in 8C, Bentsion testified, "[t]here was a conversation.  I was not present," though when pressed he conceded that it was "very possible" that he was present.  (B. Cohen: Tr. 47).  Upon being read his deposition testimony, he confirmed that he was present during that conversation and that Naomi stated during the conversation that the previous rental tenants in 8C had been paying $3,200 per month.  (B. Cohen: Tr. 48).  He testified at trial that he could not remember whether "there was an agreement between David and Nicole and [his] wife that they would pay $3,000 a month."  (B. Cohen: Tr. 49).  At his deposition, however, he had testified that he was present for a conversation during which "it was agreed that David and Nicole would pay $3,000 to [him] and Mrs. Cohen." (B. Cohen: Tr. 50).  Bentsion testified at trial that he "did not object" to the payment of $3,000 by David and Nicole to Naomi.  Id.  He acknowledged that at some point, the amount that David and Nicole paid each month went down to $2,600, but stated, "I wasn't in the conversation so I don't know what was said and why it was said" with respect to the rent reduction.  (B. Cohen: Tr. 51-52).

Bentsion testified that he did remember, however, a specific conversation with David in which he told David that he was "going to save the money that [David] had paid to [Naomi]" and give the money back to David — a conversation during which both of them were "shedding tears."  (B. Cohen: Tr. 53, 54).  Bentsion testified that he then "started to keep track in [his] mind of the money that David and Nicole were paying every month."  Id.  When asked if, in his mind,

8

he was "subtracting the cost of the maintenance that [his wife] was paying every month for 8C," Bentsion responded, "[i]t's not accurate but yes something like that.  Yes.  I wanted to pay him back his money . . . I wanted to give him back his money."  (B. Cohen: Tr. 54).  He confirmed, however, that he never actually wrote any numbers down anywhere, testifying that "[t]here was no reason for it" because it was "strictly a mental accounting."  (B. Cohen: Tr: 54-55).  He never discussed this accounting with David and did not tell David any amount that he had saved.  Id. Nor did he "set money aside to give . . . to David."  Id.

Bentsion acted as general contractor for the renovations on a new apartment that David and Nicole had purchased while they were living in 8C.  (B. Cohen: Tr. 56).  Bentsion testified, "I spent the money and from time to time I would ask [David] for some money if he had any and he would give me any installments money.  But he always was in arrears because I spent more than he was able to withdraw or that he gave me."  Id.  David reimbursed Bentsion "[f]or partial [sic] of the costs."  Id.  That is, "the costs of the renovation exceeded the amount that David and Nicole originally budgeted for them," and Bentsion "covered the difference between what it cost to complete the renovations and what David paid" Bentsion for them.  (B. Cohen: Tr. 57).  The difference was "about $40,000."  Id.  He testified, "I just told [David] that he doesn't have to pay anymore.  But I did have the accounting and I figured this is basically the return of the money that he paid my wife."  Id.  He clarified, however, "I did not make the accounting," meaning that he did not specifically calculate whether the costs forgiven to David were equivalent to the amounts that David and Nicole had paid Naomi for living in 8C.  (B. Cohen: Tr. 58).  He agreed with the characterization that it "eased [his] conscience regarding the money that they paid to [him] while they lived in 8C."  (B. Cohen: Tr. 59).

When David and Nicole lived in 8C, they paid all their own utility bills and used keys to

enter 8C which did not also unlock 8A.  (B. Cohen: Tr. 59).  Bentsion noted, however, "they had

my keys to my apartment and I had theirs."  Id.  With respect to whether or not he would knock

on the door before visiting 8C, Bentsion answered, "[s]ometimes.  But basically yes.  But it

doesn't necessarily mean a blanket statement because many times I would enter without."  (B.

Cohen: Tr. 60).  At his deposition, however, when asked, "[s]o you would knock before you

went in?" to 8C, Bentsion responded in the affirmative.  Id.  During the time that David and

Nicole lived in 8C, Bentsion kept books in one of their closets.  (B. Cohen: Tr. 60-61).  He had

also kept books in one of the closets in 8C, and some other items in the master bedroom closet of

8C, when prior renters lived there.  (B. Cohen: Tr. 61).  During the time David and Nicole lived

in 8C, Bentsion visited that apartment in order to retrieve items stored there and to visit his

children and grandchildren.  Id.  When asked if "there was no other way that [he was] using 8C"

during that time, Bentsion responded, "I don't know what you mean by 'using,'" but clarified,

"[y]es.  I guess it's correct.  They were there.  That was it."  (B. Cohen: Tr. 61-62).  Bentsion

never listed 8C as his home address on any document.  (B. Cohen: Tr. 63).  With respect to

whether he "ever told anyone that [he] lived at 8C," he responded, "[y]es, I did.  Many times.

When I purchased items that were earmarked for 8C I said 8C."  Id.  At his deposition, he stated,

"I cannot remember any conversation where I mentioned hey, look, I live in 8C."  Id.

 On the Cohens' 2003 tax return, Bentsion prepared a depreciation schedule which

reflected the calculation of the depreciation deduction he took for 8C in 2003.  (B. Cohen: Tr.

66; Gov't Ex. K at 116).  Bentsion understood that a taxpayer could only take depreciation for a

property if it is used as a business.  (B. Cohen: Tr. 66).  Bentsion also prepared a 2003 Schedule

E, which is used to report rental income, among other things.  (B. Cohen: Tr. 65-66; Gov't Ex. K

at 115).  Bentsion listed the payments from David and Nicole on the Schedule E for 2003, which

totaled $31,200.  (B. Cohen: Tr. 66-67, 68; Gov't Ex. K at 115).  David and Nicole lived in 8C

for all of 2003.  (B. Cohen: Tr. 67-68).  Bentsion testified that reporting the money received

from David and Nicole as rental income "was a mistake" although he "did not amend the

return."  (B. Cohen: Tr. 68).  He again stated, as on direct examination, that it was also a mistake

to indicate on question "2" of the Schedule E that no member of his family used 8C for more

than 14 days or ten percent of the days it was rented in 2003.  (B. Cohen: Tr. 69).  Bentsion

"conceded" that the correct answer to that question was "yes."  Id.

Bentsion prepared a joint 2004 tax return for himself and Naomi.  (B. Cohen: Tr. 70).

Bentsion and Naomi continued to receive payments from David and Nicole for the months

during 2004 that they lived in 8C.  (B. Cohen: Tr. 70-71).  However, Bentsion "did not report

having received any rental income in 2004"on the 2004 tax return.  (B. Cohen: Tr. 71).  As of the

date he signed the 2004 return, 8C was on the market.  Id.

Bentsion hired David Lipton to prepare the Cohens' 2005 tax return.  Id.  He told Lipton

that "8A and 8C were one contiguous apartment used by [him] and his children."  Id.  Bentsion

said it was Lipton who suggested that the sale of 8C was analogous to the sale of two rooms in

8A.  (B. Cohen: Tr. 71-72).  When asked again if Bentsion "specifically told [Lipton] that the

sale of 8C was analogous to the sale of two rooms in [his] apartment," Bentsion responded, "I

can't remember.  I don't remember the conversation that I had with him."  (B. Cohen: Tr. 72).

After having had his recollection refreshed with his deposition testimony, Bentsion clarified that

he did tell Lipton that "the selling of the apartment was like selling two rooms of my apartment."

(B. Cohen: Tr. 72).

Lipton prepared the Cohens' 2005 tax return "at [Bentsion's] direction."  (B. Cohen: Tr.

73; Gov't Ex. I).  Bentsion provided Lipton with a depreciation schedule which reflected that he

had made $78,500 in improvements to 8C during 2004 and 2005.  (B. Cohen: Tr. 74-75; Gov't Ex. I at 59).  All of the renovations took place in the eight months prior to the sale of 8C.  (B. Cohen: Tr. 75).  Bentsion also provided Lipton with a letter and accompanying information that Lipton would need in order to prepare the 2005 return.  Id.; Gov't Ex. I at 81.  The letter states, "[t]he capital gain calculation for this transaction [i.e., the sale of 8C] in my opinion should be based on allowing the exclusion of [] $500,000."  Gov't Ex. I at 81.  The letter then noted, "[o]bviously then I need to pay tax on all the depreciation taken throughout the years, on the balance of the gain after the exclusion if there is any . . . . "  Id.  In another document labeled "Schedule D" Bentsion wrote, "[p]lease note that the sale of my apartment as aadjacent [sic] apartment use by my family for two consequitive [sic] years qualify it for the combined exclusion of $500,000."  Id. at 98.  When Lipton calculated the gain that resulted from the sale of 8C for the Cohens' 2005 return, Lipton excluded $500,000.  (B. Cohen: Tr. 77).  The 2005 return did not reflect that there had been a sale of 8C.  Id.

On re-direct examination, Bentsion testified on several issues related to the 2003, 2004, and 2005 tax returns.  On the Schedule E filed with the 2003 return, on which he reported rental income, he reported a loss.  (B. Cohen: Tr. 83; Gov't Ex. K at 115).  On the 2004 return, he did not report any income related to 8C.  (B. Cohen: Tr. 83; Gov't Ex. L).  He did not report any income, depreciation, or deductions related to 8C on the 2005 return.  (B. Cohen: Tr. 83; Gov't Ex. I).

### 2. Nicole Cohen

Nicole Cohen, the wife of the Cohens' son David, testified that the Cohens suggested the idea of her and David moving into 8C after the planned purchase of a new apartment fell through.  (Nicole Cohen: Tr. 88).  She had privacy concerns about living right next to her in-

laws.  Id.  She tried to alleviate those concerns by, among other things, asking them to knock

before coming in to 8C.  (Nicole Cohen: Tr. 88-89).  With respect to monthly payments to her

in-laws, "David dealt with that," but she did know that David wrote a check approximately every

month to her in-laws.  (Nicole Cohen: Tr. 89).  When asked if she ever believed that any of these

payments would be refunded to herself and David, she responded, "I don't think so."  Id.  She

also testified that she did not remember if she would have known of such an arrangement

between David and Bentsion.  (Nicole Cohen: Tr. 90).  At her deposition, she testified that had

there been such an arrangement between David and his parents, David would have shared that

with her.  (Nicole Cohen: Tr. 91).[4]  Regarding her in-laws' use of 8C, Nicole testified that they

kept some items in the foyer and a few boxes of things in the babies' room but that her family

still had plenty of space for their own things.  (Nicole Cohen: Tr. 91-92).  She never asked her

in-laws to move any of their items out of 8C.  (Nicole Cohen: Tr. 92).  When the twins were

born, Naomi would babysit for them, but "not on a fixed schedule."  Id.  Nicole never paid

Naomi for babysitting nor did she have any discussion with her in-laws pertaining to payment

for babysitting.  Id.  She never got the idea that her in-laws believed she was paying them for

babysitting, nor did she ever hear anyone say the money she and David paid to them every

month was for babysitting.  Id.  When Nicole went back to work part-time in September 2003,

she hired a babysitter.  (Nicole Cohen: Tr. 92-93).  Bentsion acted as general contractor for the

renovations on their new apartment.  (Nicole Cohen: Tr. 93).  She and David reimbursed

Bentsion for "all of the costs of the renovations except for his labor."  Id.  She never believed

---

[4]  While the Court stated, without objection, that it would treat Nicole's deposition
testimony on this point as not being substantive evidence, see Tr. 91, Rule 801(d)(1)(A) of the
Federal Rules of Evidence in fact allows inconsistent deposition testimony to be treated as "not
hearsay."

that her in-laws were reimbursing her and David for the money they had paid while living in 8C by paying for the renovations.  (Nicole Cohen: Tr. 93-94).

       3.  <u>Naomi Cohen</u>

Naomi Cohen testified that when the Cohens rented 8C to non-family members, rental payments were made out to her and she deposited those payments into her checking account. (Naomi Cohen: Tr. 97).  She used that account to pay for, among other things, the monthly maintenance for 8C, which was $1,065.87 as of February 2005. (Naomi Cohen: Tr. 96-97).  She used the remainder of those payments to pay for living expenses, clothes, and personal items. (Naomi Cohen: Tr. 98).  David and Nicole, like non-family tenants, paid 8C's electric, telephone, and cable bills.  (Naomi Cohen: Tr. 98-99, 105).

Regarding her relationship with David and his family, Naomi testified that she had a close relationship with him and his wife.  (Naomi Cohen: Tr. 99).  She frequently had Friday night dinners with David and Nicole before they had children and continues to do so.  <u>Id.</u>  She sees her son on at least a weekly basis and currently babysits his children on request.  <u>Id.</u>  When asked if David and Nicole give her money when she babysits, Naomi responded, "[n]o. Definitely no."  <u>Id.</u>  When asked if, before David and Nicole moved into 8C, David and Bentsion discussed how much David would pay each month, Naomi gave several responses.  She first stated, "I don't think they discussed it.  I think my son assumed he would have – he would give something because he was doing – he was living in our apartment."  (Naomi Cohen: Tr. 100). She added, "I'm pretty sure they didn't.  I think it was my son's idea.  Basically, he would not live – even grown-up children living in their parents' apartment a lot of times help out.  It's still their apartment."  (Naomi Cohen: Tr. 101).  When the Court asked for clarification on whether there was ever a discussion on this topic, Naomi responded, "[h]e might have said 'I'm going to

pay for the apartment because I'm living in it' because I managed paying the upkeep." Id.
When the Court asked who participated in the conversation, Naomi stated, "I know it was with
me. My husband was probably there. Possibly was there. I don't remember. It's a long time
ago." (Naomi Cohen: Tr. 101-02). She ultimately confirmed that the discussion was between
herself and David. (Naomi Cohen: Tr. 102). This portion of her testimony, however, was
inconsistent with the testimony she gave at her deposition. At her deposition, when Naomi was
asked if she was involved in this conversation, she answered, "[n]ot really, no." Id.

Naomi further testified that when David and Nicole moved into 8C, she understood that
they were going to continue to look for an apartment to buy. (Naomi Cohen: Tr. 103). David
and Nicole provided Naomi with a check every month they lived in 8C, which she deposited into
her personal account and used to pay the maintenance for 8A and 8C. (Naomi Cohen: Tr. 103-
04). Throughout the time that David and Nicole lived in 8C, Naomi had Friday dinners with
them, but there was no other fixed meal time. (Naomi Cohen: Tr. 104). David and Nicole asked
Naomi to let them know before she and Bentsion were coming over, and she agreed to that
request. Id. During this time, Naomi kept some of her Passover items in 8C's kitchen, along
with some other items in the top of the closet in David and Nicole's bedroom, but did not use 8C
during this time in any way that did not involve David, Nicole, or their children. (Naomi Cohen:
Tr. 105). Naomi never listed her home address as 8C on any document. (Naomi Cohen: Tr.
109-10).

Naomi's attorney then asked her to elaborate upon what agreements she had made with
David about monthly payments while he was living in 8C. (Naomi Cohen: Tr. 113). She
testified that the agreements were "[t]hat he would give some money towards the apartment."
Id. She stated that she did not remember the exact amount that was initially agreed upon. Id.

15

4.  David Cohen

David Cohen testified that his parents had expressed concern to him about the loss of

rental income from 8C.  (D. Cohen: Tr. 118).  He testified that there was "the idea" that he and

Nicole "would help pay for some . . . of the expenses" of his parents owning 8C.  (D. Cohen: Tr.

118-19).  He addressed his parents' concern about the loss of rental income by "stating that [he]

wanted to help out during the time period that [he] was living in 8C."  (D. Cohen: Tr. 119).  He

testified that there was one discussion, or potentially multiple discussions, between himself and

his father regarding what amount he and Nicole would pay in exchange for living in 8C.  Id.

Nicole and Naomi were present "[a]t least for one" such discussion.  Id.  He testified that during

one discussion, he and Nicole and his parents all agreed that $3,000 per month would be a fair

amount to pay.  (D. Cohen: Tr. 120).

When asked if he and Nicole had asked Naomi to come over to 8C "only when [they]

asked her to come over," David said, "[i]t wasn't that formal, but there was a sense that, you

know, don't just come in and walk in the door."  (D. Cohen: Tr. 121).  When asked if they had

asked Naomi to "at least knock before she came in," he responded, "I believe there was a

conversation where that was discussed."  Id.  He testified that he and Nicole viewed living in 8C

as "a nice temporary solution for some period of time undefined."  (D. Cohen: Tr. 122).

David wrote checks to Naomi each month, ranging in amounts from $2,600 to $3,000

while he was living in 8C.  (D. Cohen: Tr. 123; see Gov't Ex. B, C).  The "base amount" he paid

for the first nine months that he lived in 8C was $3,000.  (D. Cohen: Tr. 123).  On the memo line

of the first check David wrote to Naomi after moving into 8C, dated November 12, 2002, David

wrote "November rent." (D. Cohen: Tr. 130; Gov't Ex. B at 10).  After that month, David

stopped writing that on the memo line because Bentsion "said to [him] that the payment was not

16

rent." (D. Cohen: Tr. 130).  There was a time when David and Nicole "started consistently

paying less" to David's parents each month.  (D. Cohen: Tr. 128).  According to David, he had a

conversation with his father, the "net effect" of which was that his "father suggested [David and

Nicole] put money aside for the children" and that they "decided to do roughly $400 a month,

and, as such, they said don't worry we're paying the 400."  (D. Cohen: Tr. 128-29).  David

started putting $400 into a college savings plan for his sons and reduced the monthly payment to

his parents to $2,600.  (D. Cohen: Tr. 129).  With respect to a check for $ 2,400 dated August 24,

2003, David testified that the lower payment amount reflected the fact that his parents offered to

pay for a $200 stroller.  (D. Cohen: Tr. 127-28; Gov't Ex. B at 6).

David testified that his parents babysat for his twin sons at least once per week, on an as-

needed basis, rather than on a set schedule.  (D. Cohen: Tr. 131).  He never financially

compensated his parents for babysitting "other than possibly buying them dinner."  Id.  When

asked if he would utilize 8A without his parents' permission, David responded, "I would

sometimes go [into Apartment 8A] and find things or do things.  I always had the keys to my

parents' house . . . They never set a rule.  I typically, as a matter of courtesy, wouldn't invite

friends over and use the house without asking first."  (D. Cohen: Tr. 131-32).  He could not

recall at trial whether he would have "gone over to their apartment without asking them."  (D.

Cohen: Tr. 132).  At his deposition, when asked if he would "utilize the 8A unit while living in

8C in a way that didn't involve [his] parents," David testified, "I wouldn't.  I think we may have

brought people over there or used the television once or twice, but I don't think we would have

just gone over there without asking them."  (D. Cohen: Tr. 132-33).

After he moved into 8C, David continued to look for an apartment to buy.  (D. Cohen:

Tr. 133).  He bought an apartment in November 2003.  Id.  On David and Nicole's draft

application made to the co-op board for the new apartment, David listed his parents as their "landlord." (D. Cohen: Tr. 134-35; Gov't Ex. R at 1461). Bentsion acted as general contractor for the renovations on the apartment but David did not pay Bentsion for "his time or labor." (D. Cohen: Tr. 135). With regard to reimbursement for "the expenses for the supplies and labor performed by other people," David testified, "I reimbursed him at least part of it. I don't have a full accounting in my head of how much . . . I know that he was keeping careful count of all the expenses primarily because of . . . flip tax rules . . . where the amount of money that you pay for the apartment is then deducted from the sale and you add to the amount of the deduction and renovation that you did." Id. In other words, he believed that his father "kept meticulous track of the expenses incurred on the apartment" in order to "help reduce the flip tax." (D. Cohen: Tr. 136). At some point after the construction was completed, Bentsion provided David with "a table . . . [that] summarizes at a high level . . . all of the materials and other expenses that he incurred." (D. Cohen: Tr. 137). David elaborated that he "did not do a complete accounting for all of the expenses" and "never really studied the document." Id. He testified that, as a result, he did not know whether or not he reimbursed his father for all of his expenses. (D. Cohen: Tr. 137-38). At his deposition, David had testified, "I compensated him or I should more accurately say I reimbursed him for out-of-pocket expenses. But that's it." (D. Cohen: Tr. 138).

### 5. Anthony LaVilette

Anthony LaVilette, an internal revenue agent at the IRS, testified that he first came to be familiar with the Cohens when their "tax return was selected for audit" and "the manager assigned that case to [him]." (LaVilette Tr. 140-41, 143). He indicated that his first meeting with the Cohens took place on May 28, 2008, and that toward the end of the meeting, LaVilette's on-the-job instructor "started taking part in the meeting as well." (LaVilette: Tr. 145). As is

usual practice, LaVilette first asked the Cohens whether they noticed anything in the course of

preparing for the interview that they wanted to bring to his attention.  Id.  In response, Bentsion

told LaVilette that he "was grateful for the audit" because he discovered that his investment

company had been overcharging him.  Id.  LaVilette testified that while Bentsion was telling him

about these overcharges, he was also showing LaVilette the accompanying statements.

(LaVilette: Tr. 145-46).  LaVilette testified, "there were some big numbers on these statements,

big amounts, I should say, of income sitting in these statements which did not balance against

the 2006 return I was looking at."  (LaVilette: Tr. 146).  Because the "numbers were just higher

than what was on the 2006 return," LaVilette "started asking about these numbers."  Id.

LaVilette asked the Cohens, "[w]here did this money come from?"  Id.  He testified that "at first

Mrs. Cohen started saying that they were transfers from their savings.  And then Mr. Cohen

added that well the majority was from the sale of a property that they had."  Id.  This was the

first time LaVilette learned that the Cohens had sold a property.  (LaVilette: Tr. 146-47).  Naomi

"seemed surprised that Mr. Cohen said those words," and "they both turned and looked at each

other," but "Mr. Cohen continued to talk about the sale of this apartment."  (LaVilette: Tr. 147).

Naomi "kept staring at [him] as if it was something that wasn't supposed to be said" but

Bentsion "continued to speak about the sale of the property."  Id.  LaVilette stated that the

Cohens told him the apartments were "next to each other and at some point they had connected

or knocked down a wall to connect both apartments together because their kids used to live

there . . . and up to about eight years prior to the sale, that the kids were living in the apartment."

(LaVilette: Tr. 147-48).

      Because "this sale that took place in 2005 . . . wasn't being reflected anywhere,"

LaVilette "wanted to ask questions about the 2005 [tax return]."  (LaVilette: Tr. 148).  However,

"legally [he] could not do that until [he] had put that year on the audit as well," so the interview with the Cohens concluded by "going over in [his] cubicle so [he] could type up the proper letters to open and to let them know that 2005 would be on the audit."  Id.  LaVilette testified that, on the way from the initial conference room to his cubicle, Naomi was talking on her cellphone.  Id.  LaVilette's instructor asked Bentsion how long he lived in the apartment and who was living in the apartment.  (LaVilette: Tr. 149).  LaVilette testified that "[d]uring that time Mrs. Cohen got off the phone and came over and said well we were mistaken.  It was us that lived there for three of the last five years."  Id.  LaVilette viewed the phrase "three of the last five years" as "a very technical term" that "[o]nly a lawyer or an accountant or somebody in the real estate business or an IRS agent will understand what that term means."  Id.  He added, "[w]hereas just five minutes ago I was just told that for the last eight or nine years the apartment was being rented.  But now she was saying that no, for the last three out of five years prior to the sale they were living there."  Id.  LaVilette then gave the Cohens an "information document request," which presented additional questions on which the IRS wanted clarification, and scheduled a second interview.  (LaVilette: Tr. 149-50).

The Cohens met with LaVilette again on July 8, 2008.  (LaVilette: Tr. 150).  David Lipton, their tax preparer, joined them.  Id.  Mrs. Cohen only stayed for about five minutes of the interview, apparently having received a call about an emergency at home.  (LaVilette: Tr. 151).  LaVilette testified that his first question in the second interview was "[h]ow long was apartment 8C being rented for."  Id.  He testified that "Mr. Cohen stated that he thinks that they had made an error in the last meeting" and stated that, when they said they had been living in 8C for three of the last five years, "what they really meant . . . was that their son had been living in the apartment from 2002 to 2005."  Id.  LaVilette stated that in response, he "pulled out the 2003

20

return and showed them that they had reported income, rental income for 2003, which did not

add up with their son living there from 2002 to 2004 if in 2003 they were reporting rental

income." (LaVilette: Tr. 151-52).  LaVilette "showed Mr. Cohen the Schedule E and showed

him that rental income on that line was showing $31,000." (LaVilette: Tr. 152).  LaVilette

testified that at this point, Bentsion said "he had made another error and he apologized and

that . . . he wasn't really sure the timeframe of when his son had lived in the apartment" and that

"there was a tenant that actually lived there in 2003 and that was paying rental income." Id.

According to LaVilette, Bentsion added that "his tenant lived there for the first half of 2003 and

his son lived there for the second half of 2003." Id.  LaVilette testified, "I wasn't getting a clear

answer.  And I could not make a decision still because this was the fourth answer I had." Id.  He

decided to schedule a third meeting and to contact some third parties "to ask them questions such

as his son, the landlord, to find out who really was living in that apartment during that

timeframe." Id.

   The Cohens met with LaVilette for a third time on July 23, 2008.  (LaVilette: Tr. 152-

53).  Lipton accompanied the Cohens, and Dexter Noel, LaVilette's manager, was also present

for the meeting.  (LaVilette: Tr. 153).  According to LaVilette, he wanted Noel to "listen to the

answers and see how [they could] wrap up and close this audit." Id.  The first question LaVilette

asked the Cohens during this meeting was "[h]ow long the last tenant lived in apartment 8C."

Id.  LaVilette testified that "[a]gain, Mr. Cohen said that the last tenant lived there for the first

half of 2003.  Or for the first six months of 2003" and paid "a total of about $20,000 for those six

months." Id.  LaVilette then "pointed the [sic] attention for the schedule E for 2003 which

showed a 31,000-dollar rental income" because "[t]here was a discrepancy there again."

(LaVilette: Tr. 153-54).  Bentsion then told LaVilette that "for the second part of the last six

months of 2003 his son and his daughter-in-law were living there and they were contributing"

and that he "didn't know how to record the amount that the son was contributing" so "they

recorded it as rental income on the schedule E."  (LaVilette: Tr. 154).  When LaVilette asked

how much of the money on the Schedule E was "contribution" and how much was "rental

income," Bentsion said that $11,000 of the amount was "contribution from their son."  Id.  With

respect to the Cohens' prior statement that they had lived in 8C for three of the last five years,

LaVilette testified, "[w]ell, they felt like, because of their son living there, it was by extension of

them living in the apartment."  (LaVilette: Tr. 154-55).  He said that "[a]t this point . . . Mr.

Cohen stated that his son lived with his wife and kids from mid 2002 to 2004 in the apartment."

(LaVilette: Tr. 155).  LaVilette added, "I reminded him that we had an income of 31,000 in

2003.  And now they were telling me again a change of conversation or the story was that it was

their son that lived there from 2002 to 2004 as if there was no tenant living there during the year

2003 or for those first six months."  Id.  He testified, "[n]ow they were saying that it was the son

that lived there from 2002 to 2004 and the entire $31,000 was not rental income."  Id.  He

testified that "Mrs. Cohen said that the $31,000 was a regular reimbursement that she was

getting from the son . . . for work being done in the apartment as well as for [a] babysitting job

that she was doing for her grandson."  Id.  Neither Bentsion nor Naomi had told him previously

that any of the money reported in 2003 was for babysitting, nor had they told him that they had

"refunded" any of this money to their son.  (LaVilette: Tr. 155-56).

On cross-examination, LaVilette clarified that the investment company statement

Bentsion showed him during their first meeting reflected "large amounts of money" and it did

not accord with LaVilette's belief that Naomi was retired and with the fact that LaVilette

"couldn't tell what [Bentsion] was doing for a living."  (LaVilette: Tr. 160-61).  Regarding

statements allegedly made by the Cohens that the money was for babysitting, LaVilette said these statements were made on July 23, 2008, the date of the last meeting.  (LaVilette: Tr. 161). When asked if he was "misled" by these statements in his audit, he said, "[t]hey made the statement.  I recorded the statement.  That's basically all of that statement about babysitting." (LaVilette: Tr. 164).  He testified that he never asked the Cohens about babysitting.  (LaVilette Tr. 165).  LaVilette confirmed that he had seen a letter from the managing agent of the Cohens' co-op, Sequoia Property Management Corporation, which indicated that David and Nicole had lived in 8C from November 2002 until September 2004.  (LaVilette: Tr. 166; Gov't Ex. G).

      6.  Dexter Noel

Dexter Noel, an appeals team manager at the Internal Revenue Service, worked as a "group manager in small business self-employed" from May 2008 until February 2009.  (Noel: Tr. 173-75).  As group manager, he "supervise[d] a group of new hires through their training period."  (Noel: Tr. 175).  Noel was responsible for supervising trainees, along with their on-the-job instructors, by selecting cases on which they were to perform audits.  (Noel: Tr. 175-76). LaVilette was one of his trainees during that period.  (Noel: Tr. 176).  He met the Cohens during a "managerial conference," which are conferences in which "the manager would listen to the taxpayer, listen to the agent, and try to resolve any discrepancies with respect to the interpretation of tax law."  (Noel: Tr. 177).  The discrepancies leading to the meeting with the Cohens "surrounded the sale of a residence."  Id.  The Cohens "had believed that the apartment . . . was excluded under 121 because it was used by a son, daughter-in-law and their grandchild."  Id.  Noel testified that "they said that they received money, they had filed a Schedule E, and they basically stated that they had received those funds for babysitting or something like that, and they weren't sure how to report it on their return, and that's why it

23

ended up on a Schedule E." (Noel: Tr. 177-78).

   7. <u>David Lipton</u>

  David Lipton prepared the Cohens' 2005 federal income tax return and was aware of the

sale of 8C when he prepared the return. (Lipton: Tr. 187-88; Gov't Ex. I). At the time of the

sale, he did not believe the sale had to be reported on the 2005 return, and he so advised the

Cohens before they signed and filed the return. (Lipton: Tr. 188).

  On cross-examination, Lipton confirmed that he asked Bentsion to provide him with the

paperwork he typically requests from a taxpayer in preparation for filing a federal income tax

return. (Lipton: Tr. 190-91). This information would include documents such as W-2s or 1099s

for the tax year for which he is preparing the return. (Lipton: Tr. 190). Bentsion provided

Lipton with, among other things, depreciation schedules for the years 2003, 2004, and 2005.

(Lipton: Tr. 192-194; Gov't Ex. I at 59-61). The 2005 depreciation schedule contained figures

representing improvements that the Cohens had made to 8C during the time that they owned it.

<u>See</u> Gov't Ex. I at 59. Lipton agreed that, from a tax accounting perspective, those

improvements increased the Cohens' basis in 8C. (Lipton: Tr. 195). Part of what he did to

calculate the basis was to add the capital improvements listed by Bentsion to the purchase price

of 8C. (Lipton: Tr. 196). The purpose of calculating the Cohens' basis in 8C was to calculate

their gain from the sale of the apartment. (Lipton: Tr. 197). The higher the value of

improvements listed, the less taxable gain there would be on the sale of 8C. <u>Id.</u> At the time he

was preparing the 2005 return, Lipton asked Bentsion if he had receipts for these improvements.

(Lipton: Tr. 198). Bentsion said he had receipts but did not actually show them to Lipton. <u>Id.</u>

  Bentsion sent him a letter, dated February 22, 2006, along with the information he

provided in order for Lipton to prepare the 2005 tax return. (Lipton: Tr. 198-99; Gov't Ex. I at

81).  A portion of the letter indicates that Bentsion claimed depreciation on 8C for 2003 but not for 2004 or 2005 because the Cohens "did use it as a family apartment, as an extension of [their] residence."  Gov't Ex. I at 81.  According to Lipton, this was the first time that Bentsion had addressed with him the subject of the tax treatment of the sale of 8C.  (Lipton: Tr. 199).  That is, the two had not discussed the tax treatment of the sale before Lipton received this letter.  Id.  Lipton also testified that Bentsion provided him with a spreadsheet labeled "Schedule D," that listed various gains, losses, and payments that were relevant to the preparation of the 2005 tax return.  (Lipton: Tr. 200; Gov't Ex. I at 97-98).  Lipton agreed that he "compared the information on this page to the original source material that [Bentsion] provided [him], and if the information on this page was accurate, then [he] used it."  (Lipton: Tr. 200).  He testified that Bentsion is "a very thorough person."  Id.  The spreadsheet reflected Bentsion's "thinking about how to treat the sale of unit 8C on his tax return," and Bentsion listed two possible methods of treating the sale before Lipton ever spoke to him about the tax implications of the sale.  (Lipton: Tr. 201; Gov't Ex. I at 97).  These were not methods that Lipton had told Bentsion about.  (Lipton: Tr. 201).

Lipton spoke to Bentsion about the tax treatment of the sale of 8C and explained to Bentsion the requirements for applying the $500,000 exclusion pursuant to Section 121. (Lipton: Tr. 202).  Lipton agreed that for a taxpayer to qualify for this exclusion from income the taxpayer has to be using the property as his or her principal residence.  (Lipton: Tr. 203).  Bentsion represented to him that he was using 8C for "personal purposes" prior to selling it.  Id.  However, Bentsion never specifically described to Lipton how he was using 8C, despite the statement in the February 22, 2006 letter that the Cohens used 8C as "an extension" of their residence.  (Lipton: Tr. 203; Gov't Ex. I at 81).  Bentsion never told Lipton that David was

25

making a monthly payment to the Cohens in exchange for living in 8C.  (Lipton: Tr. 203).  Nor did he provide Lipton with information concerning the living arrangement he had with David while David was living in 8C.  (Lipton: Tr. 203-04).  Lipton did not know at the time he prepared the 2005 tax return that David paid all of his own utility bills or had a separate phone line.  (Lipton: Tr. 204).  Lipton applied the $500,000 exclusion to the sale of 8C based upon Bentsion's representation that he was using 8C for personal purposes only.   Id.

After the IRS began auditing the Cohens, Lipton sent a letter to LaVilette, which stated that "[t]he apartment in question was part of Apt #8A.  It was to be used by the Cohen's [sic] as extension of Apt #8A."  (Lipton: Tr. 205; Gov't Ex. M).  Lipton testified that the statements in the letter were based upon what the Cohens had told him about their use of 8C, and that at the time he wrote the letter, he did not know the specific details of the living arrangement and did not know that David made a monthly payment to the Cohens while living in 8C.  (Lipton: Tr. 205-06).

C.  Credibility Findings

In a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited."  Krist v. Kolombos Rest., Inc., 688 F.3d 89, 95 (2d Cir. 2012) (citation omitted).  "[A]s trier of fact, the judge is entitled, just as a jury would be, . . . to believe some parts and disbelieve other parts of the testimony of any given witness."  Id. (internal quotation marks and citations omitted); see also Newman v. Herbst, 2011 WL 684165, at *1 (E.D.N.Y. Feb. 15, 2011) ("In any bench trial, the trial judge has to evaluate the credibility of the witnesses that testify, the witnesses' demeanor, any previous inconsistent statements by a witness, as well as the witness's explanation for any such inconsistent statements.").

We begin by noting that we accept the testimony of Nicole, David, Anthony LaVilette,

Dexter Noel, and David Lipton.  Each of these witnesses presented themselves as credible.

With respect to Bentsion and Naomi, however, we weigh their testimony in light of the evasive, inconsistent and false responses they gave to the IRS's inquiries.  The Court finds it particularly significant that the plaintiffs did not offer testimony from Bentsion or Naomi to contradict LaVilette and Noel's highly damning testimony that the Cohens made statements to them during the IRS audit that differ completely with statements they made subsequently, including at trial.

To give but a few examples, the Cohens told LaVilette and Noel that the monthly payments received from David were for babysitting.  (LaVilette: Tr. 155; Noel: Tr. 177-78).  At trial, however, each member of the Cohen family when asked denied that these payments were for babysitting.  (Nicole Cohen: Tr. 92; Naomi Cohen: Tr. 99; D. Cohen: Tr. 131).

Even more outlandishly, the Cohens told LaVilette they had connected 8A and 8C by "knocking down" a wall.  (LaVilette: Tr. 147-48).  However, the parties have stipulated that "[a]t no time did the Cohens every structurally modify 8A or 8C to combine or otherwise create internal access between the units."  JPTO ¶ 5.

Finally, on two separate visits, on July 8, 2008 and July 23, 2008, Bentsion told IRS officers that there was a tenant other than his son living in 8C during a portion of 2003 and that this tenant accounted for at least part of rental payments that had been reported on his 2003 return.  (LaVilette: Tr. 152-53).  He even gave specific amounts that this tenant paid in rent during 2003.  (LaVilette: Tr. 153).  At trial, however, no witness including Bentsion suggested that anyone other than David and his family were living in 8C during 2003.  Bentsion's statements to the contrary to the IRS officers at two separate meetings were plainly calculated falsehoods.  Bentsion was aware before the earlier of these meetings that the IRS would be

questioning him about the use of the apartment in the years prior to its sale.

Turning to one of the issues that is central to the disposition of the case, the Court does not credit Bentsion's testimony that he resolved to refund the rental money paid to his wife by David and Nicole (B. Cohen: Tr. 28) or that he told David as much (B. Cohen: Tr. 53). Nicole herself testified that she was unaware of any such arrangement and that David would have shared such an arrangement with her had it existed. (Nicole Cohen: Tr. 89-90; 93-94). David gave no testimony corroborating such an arrangement. In light of these circumstances and Bentsion's willingness to tell patent untruths to the IRS officers regarding the rental payments, the Court rejects Bentsion's testimony that an arrangement existed to refund the rental payments. This conclusion is bolstered by Bentsion's own admission that he "never wrote [any] numbers down anywhere" and that this arrangement was based upon "strictly a mental accounting." (B. Cohen: Tr. 54-55). Additionally, it was Naomi, not Bentsion, who took charge of collecting the rental money and paying the maintenance on the apartment.

The Court also does not credit Bentsion's testimony that he "rel[ied] on" Lipton's advice on how to report the sale of 8C on his 2005 tax return. (B. Cohen: Tr. 37). Lipton testified that he never discussed the tax treatment of the sale of 8C until after Bentsion had already provided him with a letter and accompanying calculations indicating that the Section 121 Exclusion was proper and that Lipton had not suggested this avenue of tax treatment. (Lipton: Tr. 199, 201). Lipton testified that his decision to apply the exclusion on the Cohens' 2005 tax return was based upon Bentsion's representation that he was using 8C "for personal purposes only." (Lipton: Tr. 204). That Bentsion made such a representation is corroborated by a notation to this effect in the materials he provided to Lipton. See Gov't Ex. I at 98.

III.  <u>DISCUSSION</u>

The Cohens brought this suit to obtain a refund of taxes paid to the IRS pursuant to 26

U.S.C. § 7422.  The Court has subject matter jurisdiction over such a suit pursuant to 28 U.S.C.

§ 1346(a)(1).  The Cohens' claim for a refund turns on the question of whether they qualify for

the $500,000 exclusion from gain on a sale of property permitted under 26 U.S.C. § 121.

Section 121 provides in relevant part:

> [g]ross income shall not include gain from the sale or exchange of property if,
> during the 5-year period ending on the date of the sale or exchange, such property
> has been owned and used by the taxpayer as the taxpayer's principal residence for
> periods aggregating 2 years or more.

26 U.S.C. § 121(a).  Thus, to obtain the benefit, "Apartment 8C must qualify as part of plaintiffs'

principal residence and plaintiffs must have owned and used Apartment 8C as their principal

residence for at least two of the last five years prior to the sale."  JPTO at 1-2.  There is no

dispute that the starting point for purposes of calculating the five-year period prior to the sale of

8C is May 12, 2000; and that from August 2002 through October 2002, and from September

2004 until May 12, 2005, 8C was "not leased to or occupied by unrelated third parties or by

plaintiffs' son.  <u>Id.</u> ¶ 19.  The parties also agree that during these two periods, amounting to

approximately 12 months, plaintiffs' use of 8C made it "part of [their] principal residence."  Pl.

Post-Trial Mem. at 10, ¶ 13; Gov't Post-Trial Reply Mem. at 2, ¶ 13.  Thus, the Cohens need to

show that 8C was used by them for an additional 12 months in order to qualify for the Section

121 exclusion.  Because David and Nicole – and starting in February 2003, their children —

lived in 8C from November 2002 until approximately August 2004, JPTO ¶¶ 10-11, the Cohens

must show that they used 8C as part of their "principal residence" during 12 of those months.

A.  <u>Applicability of Section 121 Exclusion</u>

29

As this case hinges upon the interpretation and application of an exclusion from income provided in the Internal Revenue Code, we begin by noting that "[a] taxpayer claiming an exclusion from income bears the burden of proving that his claim falls within an exclusionary provision of the Code," and that in interpreting the Internal Revenue Code, "exclusions from income are to be narrowly construed."  Taggi v. United States, 35 F.3d 93, 95 (2d Cir. 1994) (citations omitted).

26 U.S.C. § 121 permits a husband and wife filing a joint return to exclude $500,000 of the gain from income if at least one spouse meets the "ownership" requirements of subsection (a) and both spouses meet the "use" requirements of subsection (a). Id. §§ 121(b)(2)(A)(i) & (ii). Additionally, "if the taxpayer holds stock as a tenant-stockholder . . . in a cooperative housing corporation," then "the use requirements of subsection (a) shall be applied to the house or apartment which the taxpayer was entitled to occupy as such stockholder." Id. § 121(d)(4)(B).

"Whether property is used by the taxpayer as the taxpayer's residence depends upon all the facts and circumstances." 26 C.F.R. § 1.121-1(b)(1).  The term "principal residence" has been interpreted by the United States Tax Court to mean "the chief or primary place where a person lives or the dwelling in which a person resides." Gates v. C.I.R., 135 T.C. 1, 7 (T.C. July 1, 2010) (emphasis omitted).[5]  Further, "[a]lthough a principal residence may include land surrounding the dwelling, the legislative history supports a conclusion that Congress intended

---

[5]  Although decisions of the United States Tax Court are not binding on this Court, "in an area of law where Tax Court expertise may be useful in explication," courts "ordinarily give that expertise deference." LaBow v. C.I.R., 763 F.2d 125, 130 (2d Cir. 1985); accord Merkel v. C.I.R., 192 F.3d 844, 847-48 (9th Cir. 1999) ("Because the Tax Court has special expertise in the field . . . its opinions bearing on the Internal Revenue Code are 'entitled to respect.'") (citation omitted); LPCiminelli Interests, Inc. v. United States, 2012 WL 5499444, at *4 (W.D.N.Y. Nov. 3, 2012).

the section 121 exclusion to apply only if the dwelling the taxpayer sells was actually used as his

principal residence for the period required by section 121(a)."  Id. at 10.  "In establishing

whether a taxpayer has satisfied the 2–year use requirement, occupancy of the residence is

required."  26 C.F.R. § 1.121-1(c)(2)(i); accord Wickersham v. C.I.R., 2011 WL 3241353, at *8

(T.C. July 28, 2011) ("Taxpayers must occupy the residence for 24 full months or for 730 days

to meet the 2–year use requirement."); Farah v. C.I.R., 2007 WL 4440980, at *6 (T.C. Dec. 19,

2007).  Thus, it is clear that a taxpayer cannot show that a property constituted his "residence"

without showing that he "occupied" that property.  "Occupancy," in other words, is a necessary

but not sufficient condition to showing that a property was a "residence."

       1.  Relevance of 26 C.F.R. § 1.121-1(b)(2)

At the outset, we reject the Cohens' argument that 26 C.F.R. § 1.121-1(b)(2) and the

factors listed there should be used to determine whether they used 8C as their "principal

residence."  See Pl. Post-Trial Mem. at 8, ¶ 3.  That sub-section of the Treasury Regulation lists

six non-exhaustive factors which, in addition to a taxpayer's "use" of a property, are relevant to

determining a taxpayer's principal residence.  See 26 C.F.R. § 1.121-1(b)(2).[6]  However, this

provision is only applicable "[i]n the case of a taxpayer using more than one property as a

residence."  Id.  Here, the Cohens do not contend that 8C by itself was their principal residence

to the exclusion of 8A but rather that the two apartments together constituted their principal

---

[6]  These factors include: (i) "The taxpayer's place of employment"; (ii) "The principal
place of abode of the taxpayer's family members"; (iii) "The address listed on the taxpayer's
federal and state tax returns, driver's license, automobile registration, and voter registration
card"; (iv) "The taxpayer's mailing address for bills and correspondence"; (v) "The location of
the taxpayer's banks"; and (vi) "The location of religious organizations and recreational clubs
with which the taxpayer is affiliated."  See id. § 1.121-1(b)(2).

residence.  Thus, 26 C.F.R. § 1.121-1(b)(2) has no relevance because there is no claim here that the Cohens were using "more than one property as a residence."

        2.  Relevance of 26 U.S.C. § 280A(d)(3)(A)

The Cohens also make an argument relying on 26 U.S.C. § 280A(d)(3)(A).  Section 280A relates to limitations on the ability of a taxpayer to claim deductions under 26 U.S.C. § 212 — a provision that allows deductions for "all the ordinary and necessary expenses paid or incurred during the taxable year . . . for the management, conservation, or maintenance of property held for the production of income."  See Holmes v. United States, 85 F.3d 956, 959 (2d Cir. 1996) (explaining the relationship between 26 U.S.C. §§ 212 and 280A).  Section 280A(a) provides that "no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence."  A taxpayer is deemed to be using a dwelling unit as a "residence" if "he uses such unit (or portion thereof) for personal purposes for a number of days which exceeds the greater of . . . 14 days, or . . . 10 percent of the number of days during such year for which such unit is rented at a fair rental."  Id. §§ 280A(d)(1)(A) & (B).  Section 280A(d)(3)(A) provides that "[a] taxpayer shall not be treated as using a dwelling unit for personal purposes by reason of a rental arrangement for any period if for such period such dwelling unit is rented, at a fair rental, to any person for use as such person's principal residence."  Id. § 280A(d)(3)(A).

The Cohens argue that "[i]f David Cohen had not paid his parents any amount and stayed in Apartment 8C with his family," then the "use and occupancy by David Cohen and his family . . . would have counted as use and occupancy of Apartment 8C by Plaintiffs."  Pl. Post-Trial Mem. at 10, ¶ 16.  They characterize David's monthly payments as a "cost-sharing arrangement," id. (citing 26 U.S.C. § 280A(d)(3)(A)), and they argue that "[u]se of Apartment

8C by plaintiffs' son David Cohen and his family is attributed to Plaintiffs and treated as if [P]laintiffs had personally resided in Apartment 8C unless David Cohen used Apartment 8C as his principal residence <u>and</u> paid his parents fair rental value," <u>id.</u> at 11, ¶ 17 (emphasis in original) (citing 26 U.S.C. § 280A(d)(3)(A)).

In response, the Government argues that Section § 280A "is relevant only to a determination of whether a property is used for 'personal purposes.'" Gov't Post-Trial Reply Mem. at 5, ¶ 3. We agree. The provisions cited by the Cohens have nothing to do with the Section 121 exclusion and use different terminology. At most, if the Cohens could show that David and his family were not actually paying "fair rental" during the time they lived in 8C, this would merely support the conclusion that 8C was used by the Cohens for "personal purposes" within the meaning of 26 U.S.C. §280A. Even if the Cohens could make such a showing, however, that showing would be irrelevant to whether or not the Cohens used 8C as their "principal residence" within the meaning of Section 121.

### 3. Relevance of 21 C.F.R. § 1-1.121-1(e)(2)

The Cohens note, Pl. Post-Trial Mem. at 8, ¶ 4, that a "dwelling unit" for purposes of 26 U.S.C. § 121 has the same meaning as it does in 26 U.S.C. § 280A(f)(1). <u>See</u> 26 C.F.R. § 1.121-1(e)(2). The Cohens then cite to Example 4 in 21 C.F.R. § 1-121.1(e)(2), which involves a property containing multiple dwelling units. In the example, the separate dwelling units are (1) a basement apartment and (2) the upper floors of a townhouse in which the basement is located. <u>Id.</u> The example imagines a taxpayer who had previously rented the basement to tenants and claimed depreciation on the basement apartment while using the upper floors of the townhouse as a principal residence. <u>Id.</u> Notwithstanding this past arrangement, the example states that the taxpayer can still "incorporate" the basement apartment into the principal

residence by "eliminating the kitchen" in the basement apartment and by "building a new interior stairway to the upper floors." Id. If the taxpayer uses all three floors as his "principal residence" for two of the five years preceding the sale of the whole townhouse, including the basement, the taxpayer could claim the Section 121 Exclusion. Id. The Cohens point out that in such a case, "all of the dwelling units (including the previously rented one) will qualify as the principal residence for gain exclusion under 26 U.S.C. § 121." Pl. Post-Trial Mem. at 9, ¶ 8. They argue that "[t]his is exactly the situation presented in this case" because "sales of partial interests in a primary residence qualify for gain exclusion." Id. at 9, ¶¶ 8, 9. They reason that "even though one of the dwelling units may have been used as a rental property for part of the five years, it may still be combined with the remaining residential portion of the residence to form one principal residence, if the dwelling unit is converted to personal residential use and such use satisfies the two year requirement." Pl. Post-Trial Reply Mem. at 4.[7]

The Cohens' argument is beside the point, however, because it begs the question of whether 8C — the other "dwelling unit" in the Cohens' argument — was actually "converted" to the personal residential use of the Cohens. At best, Example 4 stands only for the proposition that a taxpayer may successfully alter its use of a dwelling unit formerly used as a rental property in a manner that allows it to become part of the taxpayer's principal residence. That proposition is not contested here. Indeed, the Government has conceded that during the time period when 8C was not being rented, it may considered as part of the Cohens' principal residence. Rather,

_____

[7] The Cohens argue that the Government has taken the erroneous position that "the two apartments need to have an interior connection in order to constitute one primary residence." Pl. Post-Trial Mem. at 9, ¶ 11 (citing Poague v. United States, 1990 WL 127016 (E.D. Va. Aug. 3, 1990), aff'd 947 F.2d 942 (4th Cir. 1991)). In fact, the Government has not taken this position to the Court's knowledge. In any event, the Court does not view such a connection to be necessary to claim the Section 121 exclusion.

the question here is whether 8C should be deemed part of (or an extension of) the Cohens'
principal residence during the time it was being rented to David and Nicole.  Example 4 simply
does not address this issue.

>4.  <u>Facts and Circumstances Relevant to "Principal Residence" Determination</u>

We next turn to the central question in this case: whether 8C was used by the Cohens as
their "principal residence" during the period David and Nicole were living there.  The IRS
regulation discussing the term sheds little light on how it should be interpreted.  It provides only
that "[w]hether property is used by the taxpayer as the taxpayer's residence depends upon all the
facts and circumstances."  26 C.F.R. § 1.121-1(b)(1).  Nor is the Court aware of any cases that
discuss the term in factual circumstances similar to what has been presented here.  The
Government points out that the regulation states that "[i]n establishing whether a taxpayer has
satisfied the 2–year use requirement, occupancy of the residence is required." 26 C.F.R.
§ 1.121-1(c)(2).  But the fact that "occupancy" is required is not dispositive here.  The way the
Cohens see the case, there was actual occupancy of 8C by the Cohens once David and Nicole
moved in because the Cohens view David and Nicole to be part of their family unit.  <u>See
generally</u> Pl. Post-Trial Reply Mem. at 4.  Thus, in their view, the four adult Cohens, along with
David and Nicole's children, were "occupying" both Apartment 8A and 8C.  <u>See id.</u>

The Court cannot accept the Cohens' argument, however, because they did not in fact
treat David and Nicole's living arrangement as one where all the adults and children were living
together occupying the two apartments.  Instead, the Cohens treated David and Nicole similarly
to the renters who had been occupying 8C during the 12-year period shortly before David and
Nicole moved in.  From the time they purchased the apartment in 1990 until a few months before
David and Nicole moved in in November 2002, the Cohens had rented 8C out to non-family

35

tenants.  (Tr. 43, 97; JPTO  ¶ 8).  They received rental income that had risen to $3,200 as of

August 2002 — an amount significantly more than the actual maintenance on the property,

which reached a high of $1,065.87 in 2005 at the time of the sale. (Tr. 96-97).  They treated 8C

as an income-generating property inasmuch as they claimed depreciation on the property, see

Gov't Ex. H, which Bentsion knew could be claimed only "for a property if you're using it as a

business."  (B. Cohen: Tr. 66).  The Cohens kept some belongings on the premises of 8C.  They

required the tenants in 8C to pay their own cable, electric, and gas bills.  The Cohens obviously

cannot dispute that 8C did not qualify as their principal residence during these periods.

When David and Nicole moved in, little changed in these arrangements or how the

Cohens treated 8C.  Notably, the rental arrangement came about not only because of David and

Naomi's unexpected need for an apartment but also because the Cohens were finding it hard to

find new tenants to replace the ones that had left and were concerned about the loss of rental

income.  (D. Cohen: Tr. 118).  It is against this backdrop that the Cohens decided to charge

David and Nicole a significant rent, totaling $3,000 at the beginning – only slightly less than the

amount they had been receiving from the previous tenants.  The Cohens continued to declare the

rental income from 8C as business income.  See Gov't Ex. K at 115.  They also claimed

depreciation on the property for 2003.  See Gov't Ex. H; Gov't Ex. K at 116.  Also, as was true

for previous tenants, David and Nicole maintained a separate phone line, kitchen, and mailbox

from the Cohens, JPTO ¶¶ 12-14, and paid for all of their own bills themselves, (Naomi Cohen:

Tr. 105).  Naomi handled the monthly payments from David and Nicole the same way that she

handled rental payments made in the past by non-family rental tenants: that is, by using the

payments to cover costs and living expenses.  (Naomi Cohen: Tr. 97-98, 103-04).  The Cohens

stored items in 8C both when non-family rental tenants lived there as well as when David and

Nicole lived there.  (B. Cohen: Tr. 27, 60-61; Naomi Cohen: Tr. 105).

The Cohens' argument that 8C was their principal residence during this period centers on the amount of the monthly payment made by David and Nicole.  Under the Cohens' view, the "fair rental" for the apartment is the "line" that  should be used to determine whether 8C constituted the Cohens' principal residence.  Pl. Post-Trial Reply Mem. at 6.  We disagree that this the case turns on this question in light of the fact that the regulations require us to examine "all the facts and circumstances."  Certainly, the amount of the monthly payments have significance here.  But the significance to the Court is not whether it matches precisely the market rent but rather whether the payment changed the character of the Cohens' treatment of 8C in the period 1990-2002 — a period when 8C was indisputably not the "principal residence" of the Cohens  — such that it could be said the Cohens were "occupying" 8C.

The Cohens have advanced a number of arguments as to why payments by David and Nicole should be treated as of a different character from the payments that were made by the non-family tenants.  We reject all these arguments.  First, we do not believe that the amount of the monthly payment was so far from the previous rental payment ($3,000 vs. $3,200) that the character of this payment changed.[8]  We also reject plaintiffs' argument that Bentsion's purported intention to refund the money to David and Nicole changed the nature of the arrangement.  First, as previously discussed, we find that Bentsion's testimony on this point was not credible.  See Section II.C above.  But even if Bentsion had personally harbored such an

---

[8] This is true even if there had been competent proof that there had been some rise in market rents based on inflation.  We note that the evidence provided by the Cohens on this point — consisting of a consumer price index for housing in the entire New York City metropolitan area, including New Jersey and Connecitcut, see Pl. Ex. 3 — covers too many categories of housing in disparate areas to be of any use on the question of the proper market rent of 8C in 2002.

intention, there is no credible evidence that this intention was communicated to David or Naomi, and thus we cannot find that it formed part of the financial arrangements between David and Naomi, who actually dealt with the payments relating to the rental.

It is also clear that the monthly payments were not a "cost-sharing" arrangement, see Pl. Post-Trial Mem. at 10, ¶ 16, that might be expected in a family group that was occupying a single residence. There was no evidence of any such "cost-sharing." Instead, the evidence was clear that the monthly payments were intended to approximate the rent that the Cohens had previously received from non-family tenants — an understandable goal given that the Cohens were concerned over the loss of this income after the last tenants moved out. (B. Cohen: Tr. 48; D. Cohen: Tr. 118, 120). The lack of any intention to share costs is made all the more obvious by the fact that David and Nicole paid all their own utilities and there was no credible evidence that the amount the profit the Cohens' made from the rental payments — estimated by the Cohens themselves in their pre-trial brief to be $1,500-2,000 per month, see Pl. Pre-Trial Mem. at 6 — was used for David and Nicole's benefit.

With respect to the reduction of the $3,000 payment to $2,600, the Court finds it of little significance for two reasons. First, even the $2,600 figure is far above the actual maintenance cost on the apartment and still netted a generous profit for the Cohens. Second, the change did not constitute an unconditional reduction in the rental amount. Rather, the arrangement was that David would be required to use the $400 difference in a particular way that Bentsion desired. (D. Cohen: Tr. 128-129). Specifically, Bentsion wished to contribute $400 monthly towards his grandchildren's education. Instead of going to the trouble of writing a check to David and Nicole monthly for $400, he undertook to have an existing obligation from David and Nicole reduced by that amount. This was the same procedure that the Cohens used when they wished to

purchase a stroller for David and Nicole.  Thus, what seems on the surface to be a $400

reduction in rent was in actuality a mere artifact of the money transfer arrangements.  It is of no

moment that Bentsion presumably never made such an arrangement with any previous tenant

because Bentsion had no reason to wish to contribute to the education of the children of any of

his previous tenants.  His desire to make such an arrangement with David and Nicole, however,

had nothing to do with the whether the Cohens were "occupying" Apartment 8C.   Instead, it was

based entirely on who happened to be the renter of 8C.[9]

Furthermore, the Cohens' having reported rental income and claiming depreciation for

8C during 2003 was entirely inconsistent with their claim that they used 8C as part of their

principal residence during that time.  See Gov't Ex. K at 115-16.  As stipulated by the parties,

the period that David and Nicole lived in 8C encompassed the entirety of the year 2003,

JPTO ¶ 11, and Bentsion testified at trial that he understood at the time he prepared the 2003

return that a taxpayer can only take depreciation if he used the property as a business.  (B.

Cohen: Tr. 66).  That the reporting changed on the Cohens' 2004 tax return is of no significance

in light of the fact that by the time the 2004 return was prepared, 8C was already on the market

(B. Cohen: Tr. 71), and thus Bentsion had an incentive to change his characterization of the

previously-existing arrangement.

The Cohens contend that Bentsion "paid approximately $40,000 towards the cost of

---

[9]  A similar point can be made with respect to the fact that the two families shared meals and visited each other.  These interactions came about because of the closeness of the relationship, not because Bentsion and Naomi were now using 8C as their principal residence. As Naomi testified, she did "not use 8C [during this time] in any way that did not involve David, Nicole, or [their children]."  (Naomi Cohen: Tr. 105).  The personal interactions between the families thus did not alter the character of the financial arrangement that governed David and Nicole's occupancy of 8C.

renovating the apartment David and his wife bought and occupied after they moved out of

Apartment 8C" and that "[t]his payment was a gift in order to return some of the money David

and his wife paid to Naomi Cohen while they occupied Apartment 8C."  Pl. Post-Trial Mem. at

11, ¶ 20.  There is no documentary evidence of any kind to support Bentsion's claim regarding

the payments he made toward the renovation.  Nor did any other family testify at trial about this

$40,000 benefit allegedly provided to David.  Indeed, David himself appeared to be completely

unaware of it when he was questioned at his deposition.  (D. Cohen: Tr. 138).  Accordingly, the

Court does not credit Bentsion's claim on this point.  But even if we were to credit it, it would

not affect whether 8C should be considered the Cohens' principal residence since any such

benefit conferred on David and Nicole was, as the Cohens conceded, simply "a gift," and thus

did not alter the previously-existing rental arrangement with David.

In sum, the Court concludes that the Cohens have failed to prove that they used

Apartment 8C as their principal residence for two of the five years preceding its sale.

B.  Penalty

The IRS assessed the Cohens $158,759 following the audit of the Cohens' 2005 tax

return, $22,776 of which constituted a penalty and $22,104 of which was interest.  JPTO ¶ 32.

As a result, the IRS concluded that the Cohens underpaid their taxes by $113,879.  Id.

26 U.S.C. § 6662 provides for an accuracy-related penalty on any portion of an

underpayment that is attributable, inter alia, to "[a]ny substantial understatement of income tax."

Id. §§ 6662(a), (b)(2); accord Curcio v. C.I.R., 689 F.3d 217, 224 (2d Cir. 2012).  It provides that

"there shall be added to the tax an amount equal to 20 percent of the portion of the

underpayment to which th[at] section applies."  Id. § 6662(a).  The term "understatement" means

"the excess of . . . the amount of the tax required to be shown on the return for the taxable year,

over . . . the amount of the tax imposed which is shown on the return . . . . " Id.

§§ 6662(d)(2)(A)(i) & (ii).  An understatement is "substantial" if the amount of the

understatement "exceeds the greater of . . . 10 percent of the tax required to be shown on the

return for the taxable year, or . . . $5,000." Id. §§ 6662(d)(1)(A)(i) & (ii).  The parties agree that

there was a substantial underpayment in this case.

  The law allows the taxpayer to avoid a substantial underpayment penalty in some

circumstances.  Of relevance here, the penalty must not be imposed "with respect to any portion

of an underpayment if it is shown that there was a reasonable cause for such portion and that the

taxpayer acted in good faith with respect to such portion."  26 U.S.C. § 6664(c)(1).  Also, a

taxpayer may avoid some or all of a "substantial underpayment" penalty if there was "substantial

authority" supporting the taxpayer's treatment of the tax at issue.  Id. § 6662(d)(2)(B)(i); accord

Curcio, 689 F.3d at 224.  We now address each of these exceptions to the substantial

understatement penalty.

    1.  <u>"Reasonable Cause" Exception</u>

  "The determination of whether a taxpayer acted with reasonable cause and in good faith

is made on a case-by-case basis, taking into account all pertinent facts and circumstances," and

"[g]enerally, the most important factor is the extent of the taxpayer's effort to assess the

taxpayer's proper tax liability."  26 C.F.R. § 1.6664-4(b)(1).

  The Cohens argue that they "relied on their preparer's advice in deciding how to

complete the [2005] return and such reliance was reasonable under the circumstances."  Pl. Post-

Trial Mem. at 12, ¶ 22.  The governing regulations provide that "[r]eliance on . . . the advice of a

professional tax advisor . . . does not necessarily demonstrate reasonable cause and good faith."

26 C.F.R. § 1.6664-4(b)(1).  "Reliance on . . . professional advice,  . . . however, constitutes

reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id. The United States Tax Court has articulated a three-pronged test, the elements of which a taxpayer must prove by a preponderance of the evidence, in order to negate a Section 6662(a) penalty based upon the claim that the taxpayer reasonably relied on a professional's advice. See, e.g., Olekanna v. C.I.R., 2013 WL 361099, at *3 (T.C. Jan. 30, 2013); Estate of Lee v. C.I.R., 2009 WL 1118876, at *5 (T.C. Apr. 27, 2009). The test has been stated in various formulations but in essence requires a showing that: "(1) [t]he taxpayer reasonably believes that the professional upon whom the reliance is placed is a competent tax adviser who has sufficient expertise to justify reliance; (2) the taxpayer provides necessary and accurate information to the adviser; and (3) the taxpayer actually relies in good faith on the adviser's judgment." Estate of Lee, 2009 WL 1118876, at *5 (citing Neonatology Assoc., P.A. v. C.I.R., 115 T.C. 43, 98 (T.C. 2000), aff'd 299 F.3d 221 (3d Cir. 2002)).

The Cohens cannot prove the second or third elements of this test. As to the second element, "good faith" reliance cannot be shown "if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item." 26 C.F.R. § 1.6664-4(c)(1)(i). Here, Lipton applied the exclusion based upon Bentsion's representation that he used 8C "for personal purposes only" during the relevant time period. (Lipton: Tr. 204). Bentsion, however, never told Lipton that David made a monthly payment to Naomi while David was living in 8C. (Lipton: Tr. 203). Nor is there evidence that Bentsion conveyed to Lipton that he had reported rental income and claimed depreciation on 8C for the 2003 tax year. See Gov't Ex. K at 115-16. The letter Bentsion sent to Lipton prior to the preparation of the 2005 tax return states without elaboration that the Cohens "did use [8C] as a family apartment, as an extension of [their] residence." Gov't Ex. I at 81. Thus, the Cohens did

not provide necessary and accurate information to Lipton with respect to the 2005 return.

The Cohens cannot prove the third element of the test, either, because the evidence indicates that Bentsion did not actually rely on Lipton's advice regarding the proper tax treatment of 8C. As already discussed, Lipton had never discussed the appropriate tax treatment of 8C with Bentsion prior to receiving the letter that indicated Bentsion's opinion that the Section 121 exclusion was appropriate. (Lipton: Tr. 199; Gov't Ex. I at 81). Thus, it was Bentsion's idea to apply the exclusion, and he did not "actually rely" on Lipton's tax advice.

In sum, the Cohens have not shown the applicability of the "reasonable cause" exception to the underpayment penalty available under 26 U.S.C. § 6664(c)(1).

### 2. "Substantial Authority" Exception

The governing regulations provide that

> [t]he substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50–percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662–3(b)(3).

26 C.F.R. § 1.6662-4(d)(2). The "reasonable basis" standard, in turn, is "a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim." Id. § 1.6662-3(b)(3). Under the regulations, substantial authority exists "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Id. § 1.6662–4(d)(3)(i); accord TIFD III-E, Inc. v. United States, 666 F.3d 836, 848 (2d Cir. 2012).

The Cohens offer no argument in favor of the application of this standard except for the

following sentence in their post-trial memorandum: "Clearly the Treasury Regulations and case law cited in this brief constitute substantial authority."  Pl. Post-Trial Mem. at 13, ¶ 23.  Many of the authorities cited by the Cohens, however, we have rejected as inapplicable, including the six factor test listed in 26 C.F.R. § 1.121-1(b)(2) and the principals of "fair rental" contained in 26 U.S.C. § 280A.  See Pl. Post-Trial Mem. at 8, ¶ 3; id. at 8, ¶¶ 4-7.  On the other hand, the Government has pointed to no cases or other authorities that are based on facts similar to the facts here.  Rather, their argument is supported almost entirely by the text of the statute and the governing regulations — none of which directly speak to the applicability of the Section 121 exclusion in the circumstances of this case.  Thus, once the authorities rejected by the Court are eliminated, both plaintiffs and the Government are essentially relying on the same authorities. This is not surprising given that the question of whether property is the taxpayer's principal residence "depends upon all the facts and circumstances."  26 C.F.R. § 1.121-1(b)(1).

The regulations, however, do contemplate a situation where there are no authorities that specifically address the issue raised by the taxpayers' treatment of an item on their tax return. The regulations provide that

> [t]here may be substantial authority for the tax treatment of an item despite the absence of certain types of authority. Thus, <u>a taxpayer may have substantial authority for a position that is supported only by a well-reasoned construction of the applicable statutory provision.</u>

26 C.F.R. § 1.6662-4(d)(3)(ii) (emphasis added).

In light of this regulatory provision, we do not find the absence of case law and other fact-specific authorities to be a bar to the Cohens' claiming the benefit of the "substantial authority" exception.  But the implication of this provision is that a taxpayer will not have "substantial authority" to support a position where he or she cannot offer a well-reasoned

construction of the applicable statutory provision.  In this case, the Cohens cannot prevail on this point because we do not believe they have offered a "well-reasoned" construction of Section 121 or the governing regulations.  We note that the "substantial authority" standard is higher than the "reasonable basis" standard, which is itself "a relatively high standard of tax reporting."  26 C.F.R. § 1.6662-3(b)(3).  The Cohens' position was not frivolous.  But, given the circumstances here — including  their having claimed depreciation for 8C in 2003 as if it were a business, their reporting the payments from David and Nicole as rental income, and their charging David and Nicole a rent that netted them a significant profit — we cannot say that their position met a standard even higher than the "reasonable basis" standard,  a standard that is itself "significantly higher" than the frivolous standard.  Accordingly, the "substantial authority" exception is not applicable, and the substantial understatement penalty was properly applied.

VI. <u>CONCLUSION</u>

 For the foregoing reasons, the plaintiffs have failed to demonstrate that they are entitled to a refund of any of the tax, interest, or penalties they have paid.  The Clerk is requested to enter judgment in favor of the defendant dismissing the complaint.

 SO ORDERED.

Dated: February 28, 2014

 New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge
